1  ROBERT R. POWELL, ESQ.  CSB#159747
   DENNIS R. INGOLS, ESQ.    CSB#236458
2  LAW OFFICES OF ROBERT R. POWELL
   925 West Hedding Street
3  San Jose, California  95126
   T: 408-553-0200 F: 408-553-0203
4  E: rpowell@rrpassociates.com

5
   Attorneys for Plaintiffs
6  MATT & KIM FREDENBURG, individually and as
   Guardians ad Litem for their minor children
7  A.F., M.F., and E.F.

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                  (SAN JOSE DIVISION)

12  MATT FREDENBURG, Individually      )   Case Number:
    and as Guardian Ad Litem for his minor  )
13  children A.F. M.F. and E.F., KIM   )
    FREDENBURG,                        )
14                                     )   COMPLAINT FOR VIOLATION
                                       )   OF CIVIL RIGHTS, FALSE ARREST,
15             Plaintiffs,             )   INTENTIONAL INFLICTION OF
                                       )   EMOTIONAL DISTRESS
16  vs.                                )
                                       )
17  COUNTY OF SANTA CLARA,             )
18  YASMINA LETONA, individually and   )
    as an employee of COUNTY OF SANTA  )
19  CLARA, ALICIA CORTEZ, individually )
    and as an employee of the COUNTY OF )
20  SANTA CLARA, SHARON BURGAN,        )
    individually and as an employee of )   DEMAND FOR JURY TRIAL
21  the COUNTY OF SANTA CLARA,         )
    CITY OF MILPITAS, PETE PROLO,      )
22  individually and as an employee of CITY )
    OF MILPITAS, OFFICER YAMAMURA, )
23  individually and as an employee of CITY )
    OF MILPITAS, And Does 1-10 inclusive, )
24                                     )
               Defendants.             )
25  _____ )



C07 04412

RS

---

# I.

## JURISDICTION AND INTRADISTRICT ASSIGNMENT

1. **JURISDICTION**. Plaintiffs bring this lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by defendants, at all times acting under color of state law, of rights secured to plaintiffs under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, and state law where applicable.

2. Jurisdiction is conferred on this Court by 28 U.S.C. section 1343 (3) and 1343 (4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. 1983. Jurisdiction is also conferred by 28 U.S.C. 1331 (a) because claims for relief derive from the United States Constitution and the laws of the United States.

3. This Court has supplemental jurisdiction over plaintiffs' state law causes of action pursuant to 28 U.S.C. section 1367(a).

4. **INTRADISTRICT ASSIGNMENT.** Venue properly lies in the Northern District of California, San Jose Division, pursuant to 28 U.S.C. Sections 1391 and 1392 and Local Rule 3-2(e), in that the events and circumstances herein alleged occurred in Santa Clara County, and at least one defendant resides in Santa Clara County.

5. Plaintiffs have exhausted their remedies, or otherwise complied with state law requirements for the filing of a Tort Claim Notice pursuant to California G.C. 905, and their claim has been rejected.

## II

## PARTIES

6. Plaintiffs MATT FREDENBURG (hereafter "MATT) and KIM FREDENBURG (hereafter "KIM") are individuals, who at all times relevant herein, were residing in Santa

Clara County, California.  Together, MATT and KIM are the natural parents and primary

guardians of A.F. (a minor child, age 1), M.F. (9) and E.F. (3), their minor children (A.F.,

M.F., and E.F. may be referred to collectively herein as "the children.").  A.F., M.F., and

E.F.'s names are reduced to initials in these pleadings, and it is Plaintiffs' intent to use this

designation for A.F., M.F., and E.F., in an effort to protect their privacy, unless and until the

court orders otherwise.

7.  MATT files this complaint individually, and as Guardian Ad Litem of said minor children,

and shall, shortly after filing of this Complaint, file a separate Application for Appointment

of Guardian Ad Litem to act in the interests of the minor children in this matter and make

such decisions on behalf of A.F., M.F., and E.F. as are routinely vested in a court-appointed

Guardian Ad Litem.

8.  Defendant COUNTY OF SANTA CLARA (hereafter "COUNTY) is a municipality,

organized and operating under the laws of California.

9.  Children's Protective Services ("CPS") is a COUNTY governmental agency organized

and existing pursuant to the law and policies of defendant COUNTY, which promulgated,

encouraged, administered, and/or permitted, the policies, practices, customs, and procedures

under which the individual defendant employees committed the acts or omissions

complained of herein, and either intentionally or negligently, whether as a result of policies,

practices, customs, or procedures, or as a result of ineffective, non-existent, or inadequate

training and education of employees, caused or were otherwise responsible for the acts or

omissions of said employees as complained of herein, and plaintiffs allege that the policies,

practices, customs, and/or procedures of COUNTY, as determined and effected in the

circumstances complained of herein by the individual defendants, constitute and/or engender

a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community, of families, and of children. The entities are referred to interchangeably herein as COUNTY.

10.    Defendant ALICIA CORTEZ ("CORTEZ"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiffs' information and belief, a case worker and/or emergency response worker, employed by COUNTY.

11.    Defendant YASMINA LETONA ("LETONA"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiffs' information and belief, a case worker and/or emergency response worker, employed by COUNTY.

12.    Defendant SHARON BURGAN ("BURGAN"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon Plaintiffs' information and belief, a case worker and/or emergency response worker, employed by COUNTY, and/or a supervisor of LETONA and/or CORTEZ.

13.    Defendant CITY OF MILPITAS (hereafter "City") is a municipality, organized and operating under the laws of California.

14.    The Milpitas Police Department ("MPD") is a governmental agency organized and existing pursuant to the law and policies of defendant CITY, which promulgated, encouraged, administered, and/or permitted, the policies, practices and procedures under which the individual defendant employees committed the acts or omissions complained of herein, and either intentionally or negligently, whether as a result of policies, practices, or procedures, or as a result of ineffective, non-existent, or inadequate training and education of

employees, caused or were otherwise responsible for the acts or omissions of said employees

as complained of herein, and plaintiffs allege that the policies, practices, and/or procedures of

the CITY, as determined and effected by the individual defendants and other police officers

of MPD, constitute and/or engender a circumstance and/or environment of deliberate

indifference to the rights and safety of citizens of the community. The entities are referred to

interchangeably herein as CITY.

15.    Defendant PETE PROLO ("PROLO"), whose acts as alleged herein were performed

under color of state law, was at all times material hereto, upon Plaintiffs' information and

belief, a police officer employed by CITY.

16.    Defendant OFFICER YAMAMURA ("YAMAMURA"), whose acts as alleged herein

were performed under color of state law, was at all times material hereto, upon Plaintiffs'

information and belief, a police officer employed by CITY.  YAMAMURA's first name is

unknown to plaintiffs at this time, and they reserve the right to request leave to amend this

complaint when the full name of defendant YAMAMURA is known.

17.    Plaintiffs are informed and believe and, based upon such information and belief, allege

that, at all times herein mentioned, each and every defendant was the agent and/or

employee of their co-defendants, and was acting either in their individual capacity or in the

scope, purpose and authority of COUNTY and/or CITY, and/or in their employment or

agency with said entities, and with the knowledge, permission, ratification, and/or consent

of said co-defendants and/or entities.

18.    Plaintiffs are informed and believe, and thereon allege, that each of the named

individual defendants herein, did knowingly and willingly, with a common intent and

scheme set forth in further detail herein below, conspire to injure plaintiff, and deprive

Complaint
Fredenburg v. County of Santa Clara, et. al.
Case No.

plaintiffs of their rights, liberties, and interests, as such rights are afforded under the United States Constitution, and the California State Constitution, and conspired generally to damage said plaintiffs and inflict great injury upon them, with the intent of causing, and so causing, a violation of their rights under the U.S. Constitution and/or California State Constitutions, and the infliction of severe emotional distress.

### III.

### FACTUAL ALLEGATIONS

19.    At approximately 1:00 p.m. on August 9, 2006, KIM went to the Goodwill Store in Milpitas, taking A.F. (then 7 months old) with her.  Following the best practice for placement of infants in car seats, she placed A.F. in the back seat, in the center of the seat, and buckled her in.  However, when KIM went into the store A.F. was sleeping and KIM forgot that A.F. was in the back seat of her car.

20.    When KIM left the store a short time later, she saw that MPD officers had removed A.F. from the car.  They would not allow KIM to speak to A.F..  KIM told the officers that her sons M.F. (then 8) and E.F. (then 3) were at home alone.  MPD officers then arrested KIM for child endangerment and transported her to the police station.

21.    At approximately 2:00 p.m., MPD Sergeant KING removed M.F. and E.F. from the Fredenburgs' home and took them to the Milpitas Police Station.

22.    Shortly thereafter, MPD contacted MATT to advise him that his children and wife were at the MPD station.  MATT gave permission for the MPD to release the children to his parents if they arrived to the police station before he did.  MATT left work within minutes and made it to the police station in less than 20 minutes, before his parents did.

23.    Approximately 30 minutes after MATT arrived at the police station, and after he was playing with his children and keeping them occupied while he waited to hear what was going to happen with KIM, PROLO informed MATT that his children were being taken into protective custody. PROLO told MATT that there was nothing MATT could do about the decision, and that it was his (PROLO's) decision.

24.    Plaintiffs are informed and believe that the decision to remove the children was made jointly with CORTEZ, who told MATT at the station that the children would be returned to him the next day, but that taking them was "standard procedure."

25.    Prior to the children's removal, MATT was never interviewed nor advised that he was under suspicion for child abuse. At no time after MATT had retrieved the children at the station, were they in any kind of imminent risk of serious bodily injury.

26.    After CORTEZ took physical custody of A.F., M.F., and E.F., plaintiffs are informed and believe that she drove them to a shelter on Union Ave.

27.    CORTEZ, PROLO, and YAMAMURA did not have a warrant for the removal of the children. At no point did they seek such a warrant from the juvenile court. At no point did exigent circumstances exist that would justify removing A.F., M.F., and E.F. from both of their parents without a warrant.

28.    The family's case was assigned to LETONA.

29.    On August 10th, 2006, MATT and KIM went to the office of LETONA at approximately 11:00 a.m., and she commenced to interview them. Both were still distraught and had virtually not slept at all the night before due to the trauma of the children being removed.

30.    LETONA started the "interview" with KIM, whom she kept in the "interview" for 2 hours and 40 minutes.  During the interview, LETONA engaged in the following actions and made the following statements with the intent to cause KIM severe emotional distress, or with reckless disregard for causing KIM severe emotional distress, and did so in the manner of making fraudulent statements, misrepresenting facts, and using coercive tactics that caused KIM duress, in order to gather KIM's statements which are admissible testimony when contained in social worker reports in juvenile proceedings under California law;

- At the beginning of the interview LETONA started to ask questions regarding KIM's marriage.  KIM told her that she was not prepared to answer questions of that nature. LETONA responded that in order to properly evaluate whether the kids could come back or not, KIM would have to answer all of her questions.  KIM agreed to do so, but then asked LETONA, "Well then shouldn't I have a lawyer here while I am answering questions?"  Despite the fact LETONA knew that her questions to KIM, and the answers given by KIM could potentially be used against KIM in the pending criminal matter, LETONA said, "No that's not how these interviews work[,] [l]awyers do not participate in the interview process."

- LETONA then asked 'what was going on with KIM that she could leave her seven month old in the car and forget her?'  KIM started to tear up, and said, "I really didn't know how I could forget her, I've been racking my brain trying to figure out how I could do that."  KIM added that ever since she had the last baby (A.F) she had been a little forgetful.  LETONA's reply was, "Well that's a nice rehearsed answer, but that's not getting us to the point of how you could have left your baby in the car."  LETONA then

opined, "Usually it is something to do with what is going on at home; something that is causing you to be stressed." LETONA claimed that M.F. had told them about mommy and daddy screaming at each other and mommy throwing things, as well as some very rigid/controlling discipline methods from daddy. LETONA then said that, "You better just be straight forward with me in order for me to make the appropriate decision about the children's welfare."

- LETONA then began to make a series of statements primarily disparaging how KIM and MATT choose to run their home vis-à-vis division of obligations. LETONA said that MATT makes most of the decisions, and that KIM is the one who keeps house, takes care of the kids, grocery shops, homeschools, etc. LETONA opined that there were "control issues" on MATT's part. She asked "isn't it true that you do not agree with every rule Matt has placed in the home." KIM agreed, but pointed that was pretty common in most marriages.

- LETONA then said, "Isn't it true that you have over 26 rules that you have to live by?" KIM denied any such "rules."

- LETONA then said, "Why is it that you have no say as to how the house is run?" KIM told her she does have some say in how the house is run! LETONA replied in a mocking and sarcastic tone, "Oh I see, you have *some* say."

- LETONA then claimed, "I can tell [M.F.] is stressed because he goes on and on." She further claimed, "He told me that he feels uncomfortable around other kids because he doesn't get to be around kids very often." KIM told her that was absolutely ridiculous and that, "He is around kids all the time and I can prove it with multiple witnesses." KIM pointed out the boy is at the church as least twice a week and he has four boys from the

church his age that he hangs out with all of the time, in addition to belonging to a home

schooling group that has various age groups and meets regularly, not to mention M.F.

seeing his cousins at least a couple times a week."

- Then, clearly implying that KIM was lying to LETONA, LETONA said, "I am going to

give you a chance to be honest with me." LETONA told her, " I have access to all your

records and I know everything.  You are not being straight with me about your marriage."

KIM said, "I am being honest with you and I am not sure what it is you are asking."

LETONA said, "So you say you have typical marriage problems, typical marriage

problems do not include physical contact." KIM said, "What are you referring to?"

LETONA then said, "There has been DV in your home." KIM replied, "DV, what is

that?" LETONA said "domestic violence." KIM then indicated she thinks she knew

what LETONA was talking about, which was an incident nearly six years prior, which in

fact involved no domestic violence by MATT. KIM told her expressly, MATT does not

hit her or the kids." This began LETONA's implicit agenda to portray MATT as an

abusive and controlling husband and father.

- LETONA said, "There are other ways to 'hit' someone, it doesn't just have to be

physical." This was followed by LETONA's saying, ""It sounds to me as if Matt crushes

you and the kids." KIM was flabbergasted and told LETONA that her husband does not

"crush" them, and that he in fact wants what is best for them.  KIM added, "He doesn't

want the kids minds filled with the garbage of the media."

- LETONA then began a series of statements, innuendo, and questions about a topic of

inter-familial relationships with in-laws, information and/or circumstances having

absolutely nothing to do with the safety of the children or the rights of the parents to

decide how to parent their children. LETONA said, "Isn't it true that Matt keeps the kids

from seeing your family?" KIM told her this was false, and that, "We see my family at

least once a week!" This did not satisfy LETONA, who then said, "Does your family

come over to your house to see you and the kids?" KIM replied that happened

sometimes, but that mostly her and the children went to her mother's home and saw the

maternal family relatives. LETONA then asked that the real reason to visit at the

maternal grandmother's home was because MATT wouldn't let family members come to

his house. KIM said that was not true, but pointed out they could come there when he

wasn't there. LETONA then continued to question and prod about why MATT did not

get along with KIM's relatives, to which KIM explained they (the relatives) did not like

the religious tenets that the family followed, or MATT's efforts to shield the children

from violent video games, television, and mainstream media culture. Absolutely none of

these questions, or line of questioning had anything to do with the safety of the children,

or their risk of abuse, or anything else related to the job LETONA was supposed to be

performing at this juncture in the matter, which was returning the children to one parent,

the other, or both, unless certain criteria under Welfare and Institutions Code 309 had

been met, and none had been met, nor were met at any time during the period the children

continued to be detained pending an initial hearing.

- LETONA then began making a series of statements and implicit threats intended to

cause the disruption of the marriage and relationship of KIM and MATT. LETONA said,

"Well I am just going to tell you right now, I can't tell you what to do with your husband,

but if you stay living with him I cannot make the recommendation to give you your

children back to you." KIM said, "So you're telling me that if I leave my husband I can

get the kids back?" LETONA replied, "I cannot tell you what to do, but I can tell you that if you are willing to make the necessary changes in your life I will then work with you to get the kids back." She also said, "I have to make a decision as to which parent it is best to place the kids with and I am looking to you to do the right thing." LETONA told her she sees a beautiful woman before her that has been "crushed" for a long time and needs to be free of it, and that she could see how MATT – whom she had never met or spoken to at this point - would be threatened by alleviating any control over KIM since KIM would have no problem remarrying. LETONA then began telling KIM about her personal life, saying that as an "example," she divorced her husband, who she claimed was "similar" to MATT, at 33, and remarried a "wonderful man" that she wishes could be cloned. KIM, clearly confronted with a situation as expressed by LETONA where she would have to leave her husband in order to regain custody of her children said, "So what I need to do is to leave?" KIM told her, "I will do whatever it takes to get the kids back and if it meant leaving MATT, I would do it." To this LETONA replied, "That's great. Consider this the first day of your new life."

- KIM then broached the issue of how much jail time LETONA thought she would get for having left A.F. in the car. With that LETONA and another social worker present began to laugh. Puzzled by their response, KIM looked at them both and said, "Did I miss something?" LETONA then looked at her and said, "No, you're just so cute. I know the D.A. and in my recommendation I will tell him what we discussed about the changes you are willing to make. You will not have jail time." KIM then said, "But D.A.'s don't care about that stuff." LETONA replied, "I know him well and he will take into consideration what I say. But I am sticking my neck out for you. So if you have a change of heart and

decide to go back to MATT, I will have to change my recommendation. It is not often I stick my neck out for people. I can count on one hand how many people I have stuck my neck out for." The other female social worker present then vouched for her, saying it is "very true." LETONA said, "Two I can remember and I know the third will now be you. I really like you and I really like your sister and I think you are someone who really wants to do what is right." LETONA then asked if KIM wanted to leave out the back door to avoid MATT in the lobby.

- Led to believe by LETONA, and feeling she had no choice in terms of having her children returned, KIM agreed and left out the back of the building. LETONA said she would tell Matt at the end of his interview what just took place and call KIM when he was leaving.

31.    KIM later learned that MATT was treated the same way by LETONA, and that false claims of what KIM had said or decided were used to attempt to extract information from MATT, which KIM is informed and believes was LETONA simply furthering her agenda of tearing apart the marriage of MATT and KIM. This added to the anxiety, frustration, and anger that KIM was experiencing, and exacerbated the emotional distress LETONA had put upon her.

32.    LETONA did not wait more than a few minutes into the interview with MATT to tell him that his wife was leaving him, and seemed joyfully smug at the pain and anguish this caused MATT. LETONA then engaged in the following questioning and exchanges with MATT, all of which was clearly intended to ensure the destruction of the marital relationship and/or any relationship between the Fredenburgs, and to cause MATT severe

emotional distress, or engaged in with reckless disregard for the likelihood of causing

MATT severe emotional distress;

- LETONA said that KIM had decided to leave the marriage because it was what KIM

thought was best for her and the kids. This was a false statement.

- LETONA told MATT that he would not be allowed to have the children, and that

CORTEZ had spoken in error when she informed MATT on the day of removal about his

ability to receive the children the next day.

- LETONA claimed that KIM had stated, "There's violence in the relationship, but I hit

him too." This was false, and KIM expressly stated to LETONA that MATT had never

hit her or the children.

- LETONA claimed that KIM had stated: "MATT is unable to handle the children and

falls apart when he has to watch them." This was false, KIM did not say that.

- LETONA claimed that CORTEZ had told her, "MATT had no control of the children in

the police station." That MATT had no control was a false statement. The children were

simply playing and killing time at the station. M.F. spent most all of the time at the

station on MATT's lap reading out loud, and E.F. was either sitting on one of the couches

or playing with one of the toys in the play room. When A.F. arrived (a bit later than M.F.

and E.F.), MATT held her and M.F. together while E.F. continued to play.

- LETONA said that KIM told her MATT has "problems" with his family members and

LETONA then said "I believe you *just recently* started talking to your father again." This

was completely false. It was also false that he had "just recently" began speaking to his

father again, and KIM did not say either of these things to LETONA.

- LETONA then claimed that KIM had told her MATT had "freaked her out" by "having Kim look at examples of CPS misconduct on the Internet." This was false and/or a misrepresentation. KIM never said that MATT had her look at examples of CPS misconduct on the internet. Rather, she said that she and her husband had looked at CPS on the internet and it had indeed "freaked" them out entirely.

- Then LETONA looked MATT in the face and said, "You are the reason behind KIM having left [A.F.] in the truck," and stated that MATT was "responsible" for what KIM had done.

- LETONA went on to state as fact that MATT was, "not involved with the children at all, essentially." This was false. MATT and KIM go through all the curriculum of their children's schooling together, raise them together, play with them together, and make decisions as a team when it comes to their children. MATT acknowledged that it was unfortunate that he sometimes has to work 12 and 14-hour days, but when there is only one breadwinner in the family that is just the way it goes.

- MATT was also told by LETONA that Sandy (sister to KIM), with whom she said she was investigating placement of the children, had stated: "I don't want Matt to know where I live." This statement was false, as KIM was present during the conversation and could hear the conversation on the phone. In actuality, LETONA asked Sandy, "Does Matt know where you live?" to which Sandy replied "I believe so[,]" to which LETONA stated, "I think he believes you live in Gilroy." Sandy replied "I used to live in Gilroy." Then Ms. Letona said to her "Is it OK that he doesn't know where you live?" Sandy replied "I guess."

- For the entire hour LETONA appeared to be soliciting MATT to engage in dragging his wife KIM through the mud, attempting to incite him to speak negatively about KIM. MATT made it clear he was not going to do that but LETONA continued to try, and seemed increasingly frustrated as MATT continued to refuse.  Several times to the questions intended by LETONA to obtain a disparaging response of some kind as to KIM, MATT answered: "My primary duty as a Father/Husband is to protect my family. KIM, as my wife, is obviously a member of my family, and I won't drag her through the mud."

33.    LETONA then prepared and had filed a petition, pursuant to California Welfare and Institutions Code §300, with the Juvenile Court alleging a "Failure to Protect."  The Petition was signed by an unknown Doe 1, purportedly on behalf of BURGAN.  Plaintiffs have no information or evidence at this time as to the identity of the signer, or whether BURGAN, in fact authorized and/or ratified the signing of her name to the Petition, which contains allegations made under oath, or as a matter of policy, practice, and procedure BURGAN's name was referenced as the person swearing out facts.

34.    The Petition contains numerous allegations which are false, and which excluded relevant exculpatory information about allegations, either separately or some aspect thereof, as part of the intentional making of a significant misrepresentation in the Petition.  These include, but are not limited to, the following;

- The allegation that when MATT learned of his children being taken to the police station, he "refused to leave work and go to the police station to pick up his children." This allegation is completely false. Intentionally left out of the allegation is the fact that MATT had in fact gone to the police station, had received back custody of his children,

and then had them taken from his custody by CORTEZ and PROLO. The allegation also left out the fact that MATT had been told in the initial contact by the police that his parents were already on the way to pick up his children and they wanted to know if he would give permission for them to take the children – which he gave, conditioned on whether he arrived first at the police station, which he did.

- The allegation that the child (A.F.) had been left in the car for "at least 25 minutes," and that it was "91 degrees," failed to include the fact that all of the four windows were open on the vehicle approximately 4 inches and the child had been evaluated at the scene and found to be within 1 degree of normal body temperature, and had suffered no injuries whatsoever.

- The completely false allegation that MATT had been arrested three times for domestic violence against KIM.

- The allegation that MATT "continues" to perpetrate domestic violence against KIM, which was and is completely false.

- The allegation that MATT had a "criminal history" that included a D.U.I., which was true, but which omitted the fact that the DUI had occurred over 4 years prior to the incident involving his wife leaving A.F. in the car and the boys unattended at the home.

- The allegation that whenever M.F. got in trouble, he was made to eat bread and water for breakfast, lunch, and dinner for two weeks was completely false.

- The Petition contained other allegations that were all allegedly based on what M.F. had said to someone, all of which allegations were either completely false, misrepresented in some significant manner, or presented without the inclusion of exculpatory aspects or

Complaint
Fredenburg v. County of Santa Clara, et. al.
Case No.

facts that would undermine the effort of COUNTY to obtain jurisdiction over the children.

35. In addition to the negative psychological and emotional effects of the removal itself on the entire family, while in the care, custody and control of COUNTY, the children suffered more trauma.

36. On his very first day in the care, custody and control of COUNTY after he was removed from his parents and placed in the Union Avenue Shelter, M.F. was sexually assaulted by another male child, Doe 2.

37. Doe 2 was found simulating sexual activity with M.F., who was found bending over on the bed with the other boy rubbing his genitalia against M.F.'s buttocks.

38. When the situation was investigated, it was learned that earlier Doe 2 had made M.F. pull down his pants and show Doe 2 his "wiener," and that Doe 2 had pulled down his own pants and rubbed his "wiener" on M.F.'s buttocks.

39. Despite COUNTY and/or some unknown employees of COUNTY knowing about this incident the very evening it happened (August 9th, 2007), COUNTY and/or LETONA delayed reporting this to KIM and MATT until five days later, on the day of the first detention hearing. At that time, after the parents had been at the courthouse approximately two hours, and had seen LETONA and made eye contact with her on not less than two occasions during that two hour period, LETONA came up and handed the parents' counsel a short memo that advised of the incident in the shelter.

40. LETONA had spoken with MATT on the phone after 4:00 p.m. on August 11th, 2006, and could have informed him of the incident that had happened with his son. However, she

did not do so. Instead, she informed him that the children were going to be released to KIM's sister pending the detention hearing on Monday the 14th of August 2006.

41.    When LETONA released the children to KIM's sister through shelter staff, no one informed KIM's sister about the sexual abuse of her nephew while in the shelter, leaving her a child that had been recently traumatized with no basis for being vigilante, understanding or appreciating any behaviors manifesting psychological stress from the incident, because she didn't know the incident had occurred.

42.    LETONA conspired with the other individually-named defendants, and unknown DOE defendants, to lie, obfuscate, and withhold evidence, so as to obtain a juvenile court ruling continuing the children in their detained status, and under the care, custody and control of COUNTY. All of said actions were undertaken for purposes not related to the health, safety, and welfare of A.F., M.F., and/or E.F., and in contravention thereof.

43.    While in the care, custody, and control of the COUNTY, the children received medical treatments, inoculations, medications, assessments and evaluations, wherein the parents were not informed or given the opportunity to respond to proposals or intentions to have said medical goods or services administered to their children, in complete violation of their parental rights and rights of familial association, in violation of the children's rights for their parents involvement in such decisions and personal attendance, and in violation of Local Rules of the Santa Clara County Superior Court – Juvenile Division, and/or Standing Orders of said court.

44.    At the initial detention hearing on August 14th, 2006, the court returned the children to their parents.

//

# IV. DAMAGES

45.    As a result of the conduct of defendants, plaintiffs suffered severe emotional distress, anxiety and general damage to their psyche, to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression, including but not limited to sleeplessness, headaches, uncontrollable bowel movements and enuresis (minor plaintiffs only), fatigue, loss of appetite, loss of weight, malaise, irritability, inability to focus, a generalized fear of authority figures and social workers and law enforcement officers in particular.  This incident also caused humiliation and embarrassment and loss of reputation in the community to plaintiffs, has caused the incursion of attorney's fees, medical fees and expenses, and is likely to cause the incursion of further medical, therapy, and/or counseling fees in the future.   Plaintiffs MATT and KIM are informed and believe, and thereupon allege, that they were placed on various state and local database registries for victims / perpetrators of child abuse, further damaging their reputation and likely causing damages in the future in their rights of membership, society, community participation, and association in their family and children's activities.

46.    Plaintiffs seek an award of exemplary (punitive) damages as allowed under federal law and pursuant to California Civil Code Section 3294 against the individually-named defendants to make an example of and punish defendants, and in the hope of deterring future conduct of a similar nature.  Defendants are guilty of oppression, fraud, and/or malice by way of the acts heretofore alleged.

//

//

# V.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1983)

[MATT, A.F, M.F., and E.F. Against PROLO, CORTEZ, YAMAMURA – Warrantless Removal]

47.    Plaintiffs MATT, M.F., E.F., and A.F., re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief for a violation of Plaintiffs' civil rights under the 4th and/or 14th Amendment to the United States Constitution, with regard to the violation of their rights of familial association with one another occasioned by their removal from MATT by defendants PROLO, CORTEZ, and YAMAMURA.

48.    Plaintiffs allege the removal of the minor children was undertaken without consent, probable cause, a protective custody warrant, or exigent circumstances justifying removal of the minor children.  This claim includes all such allegations as against the unknown defendants from CITY and COUNTY that participated, ratified, condoned, or made the decision with regard to the removal of the children on or about August 9, 2006.

49.    Plaintiffs re-allege the allegations of paragraph 45 as said damages relate to a claim for relief for a violation of their civil rights as stated.

50.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individual defendants.

//

//

## SECOND CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1983)

[A.F., M.F., and E.F. Against CORTEZ, YAMAMURA, and PROLO – Warrantless Seizure]

51.    Plaintiffs A.F., M.F., and E.F. re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief for a violation of their civil rights under the 4th Amendment to the United States Constitution, with regard to the violation of their rights to be free from unreasonable search and/or seizure, as said rights were violated as generally set forth hereinabove as a result of the physical removal of their persons from their home and parents by physical force against their will, as against CORTEZ, PROLO, and YAMAMURA.

52.    This claim includes all such allegations as against the unknown defendants from COUNTY and/or CITY that participated, ratified, condoned, or made the decision with regard to the removal of the children on or about August 9, 2006.

53.    Plaintiffs re-allege the allegations of paragraph 45 as said damages relate to a claim for relief for a violation of their civil rights as stated.

54.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individual defendants.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1983)

[MATT, A.F., M.F., and E.F. Against LETONA and CORTEZ – Continued Detention]

55.    Plaintiffs MATT, A.F., M.F., and E.F. re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief for a violation of Plaintiffs' civil rights under the 14th Amendment to the United States

Constitution, with regard to the violation of their rights of familial association with one another, as separate and distinct from removal of the minor children, and consisting of the continued detention of the minor children after removal and up to and including the return of the children 5 days after their removal, as against LETONA and CORTEZ.

56.    Plaintiffs allege that the continued detention of A.F., M.F., and E.F. after the day of removal and through their return, was accompanied and caused by said defendants' malicious intent, gross recklessness, and deliberate indifference to the familial rights of plaintiffs, and manifested in, but not limited to, the complete failure or refusal of defendants to reasonably investigate the circumstances of the family and the statements made by A.F., M.F., and E.F., and the efforts by LETONA to obtain the marital dissolution of the adult plaintiffs

57.    Plaintiffs re-allege the allegations of paragraph 45 as said damages relate to a claim for relief for a violation of their civil rights to familial association.

58.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individual defendants.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1983)

[KIM and MATT Against LETONA – 1st & 14th Amendment – Divorce Threats]

59.    KIM and MATT re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief against LETONA for the violation of their 1st Amendment rights of association, and 14th Amendment rights of familial association.

60.    As set forth hereinabove, LETONA implicitly required KIM to state that she would divorce MATT, against her will and in direct contravention of KIM's desire to maintain her traditional familial unit intact, and in coercing and causing KIM duress in said manner, did so using the ultimate familial bond, that between a mother and her children, as the reward for leaving and divorcing MATT.

61.    Plaintiffs KIM and MATT, are informed and believe and thereon allege, that in fact the practice of threatening parents with the requirement that they cease all association with each other, and/or end relationships – including marriage, in order to regain custody of their children, or for one or the other to gain custody of their children, is a widespread practice and custom of CPS that has been engaged in for years by numerous social workers, and a practice for which no social worker has ever been disciplined, investigated, or terminated.

62.    The COUNTY has been aware of this practice and custom for at least ten years prior to the filing of this complaint, and has instituted no education or system of discipline and/or reprimand for social workers engaging in this activity, such as to evidence a cold and calculated deliberate indifference to the rights of association, and familial association, as between adults and parents.

63.    The COUNTY has been specifically aware of the outrageous, manipulative, and deceitful conduct of the particular defendant LETONA for at least 7 years.  The COUNTY and/or supervisors within CPS are aware of the nickname given LETONA by co-workers and other individual employees of agencies and companies contracting with the COUNTY, which is "Terminator," refers to the Herculean efforts of LETONA to separate children and their parents and to seek to terminate parents' rights and custody of their child(ren).

64.    Despite these facts and history known to COUNTY, the COUNTY has not performed any substantive discipline or reprimand of defendant LETONA, and not terminated said defendant, evidencing further a cold and calculated deliberate indifference to the rights and safety of parents and children that become involved with CPS in the COUNTY.

65.    As a result of LETONA's conduct, KIM did leave the family home and stay away from her husband for over 48 hours after removing several personal belongings from the home, and returned to stay only with great anxiety and stress for both as to the fear that LETONA would find out and in some manner retaliate against them and/or their children.

66.    Plaintiffs re-allege the allegations of paragraph 45 as said damages relate to a claim for relief for a violation of their civil rights to familial association.

67.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individual defendants.

## FIFTH CLAIM FOR RELIEF

## FALSE ARREST / IMPRISONMENT

[A.F., M.F., and E.F. Against All Defendants]

68.    A.F., M.F., and E.F. re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief for false arrest and/or imprisonment under California law, as against all defendants.

69.    The individually-named defendants PROLO, YAMAMURA, and CORTEZ, intentionally and unlawfully restrained, detained, and otherwise confined A.F., M.F., and E.F. for an appreciable period of time, without their consent, nor was such restraint and/or detention accomplished through a valid warrant, or in the context of exigent circumstances excusing the procurement of a warrant.

70.    A.F., M.F., and E.F. re-allege the allegations of paragraph 45 at this point as said damages relate to a claim for relief for false arrest / imprisonment.

71.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all defendants.

<strong>SIXTH CLAIM FOR RELIEF</strong>

<strong>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</strong>

[Plaintiffs Against PROLO, YAMAMURA, CORTEZ, LETONA, and BURGAN]

72.    Plaintiffs re-allege and incorporate paragraphs 1 through 44, inclusive, as though fully set forth at this point, as they relate to a claim for relief and set forth all necessary elements for a claim for relief against defendants for intentional infliction of emotional distress, as against PROLO, YAMAMURA, CORTEZ, LETONA, and BURGAN.

73.    Plaintiffs allege the facts and circumstances set forth hereinabove, inclusive of the facts and circumstances surrounding the removal of the children and the failure and/or refusal to promptly return the children, the facts and circumstances surrounding LETONA's giving KIM an ultimatum regarding divorcing MATT, the facts and circumstances surrounding the performance of physical examinations, medical examinations, inoculations, and evaluations of the children without the prior notice or opportunity to attend said events being afforded to the adult plaintiffs, the facts and circumstances surrounding the inoculations given to the children, and the representations as to the return of their children in court hearings which were then undermined by the provision of half-truths and the failures to include exculpatory information in reports to the juvenile court, and the facts and circumstances surrounding the conduct of defendants CORTEZ, LETONA, and BURGAN, as well as the unknown social worker and/or social workers and supervisor(s) conducting the removal of the children and/or

directing the removal of the children on or about the afternoon of August 9, 2006, all

constituted intentional actions or omissions intended to cause severe emotional distress, and

so causing said distress, and/or were done with reckless disregard for the likelihood of

causing the plaintiffs severe emotional distress.

74.    Specific acts constituting intentional infliction of severe emotional distress performed

by defendants include, but are not limited to:

- Intentionally failing to disclose the sexual molestation of M.F. in a COUNTY

shelter, without advising either of his parents MATT and KIM of the incident in a timely

fashion, or informing the KIM's sister when receiving custody of the children, thus

precluding MATT and KIM from promptly attempting to console or otherwise comfort

M.F. after this traumatic event, and thereby prolonging and intensifying the emotional

distress and psychological damage to M.F. resulting from said molestation.

- Keeping A.F., M.F., and E.F. from their parents MATT and KIM after removal but

pending a court hearing when it was clear that none of the factors under California

Welfare and Institutions Code section 309 applied that would require the minor plaintiffs

to remain out of the care, custody and control of their parents.

- Removing the minor plaintiffs without talking with either parent about the care and

safety of the children in their care, or the care of either parent.

- COUNTY, and/or unknown Doe defendants failed to comply with California laws and

regulations and/or COUNTY polices and procedures requiring the establishment of phone

contact and/or visitation with the children promptly after removal, and in fact the parents

were told by CORTEZ that there could be no phone contact with the children.

Complaint
Fredenburg v. County of Santa Clara, et. al.
Case No.

- Coercing and manipulating KIM to the point of leaving out the back door of a building and separating from her husband.

- Lying to the parents about their rights under the law, specifically but not limited to LETONA's interference with KIM's right to counsel, and lying to MATT about what KIM had allegedly said about him, and about what KIM's sister had said about MATT knowing where she lived, as well as all specific items of falsity, misrepresentation, and the withholding of exculpatory information set forth in paragraph 34 herein above.

75.    Plaintiffs allege the actions and failures to act of the individual defendants were conducted maliciously, oppressively, and without legal or moral justification or excuse, and performed or not performed with the intent to inflict severe emotional distress, or in reckless disregard for the likelihood of causing severe emotional distress, and with malice and/or reckless disregard for the rights and safety of the plaintiffs.

76.    Plaintiffs re-allege the allegations of paragraph 45 at this point as said damages relate to a claim for relief for intentional infliction of emotional distress.

77.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individual defendants, but not to entity defendants CITY and COUNTY.

### SEVENTH CLAIM FOR RELIEF

### BATTERY

[A.F., M.F., and E.F. Against PROLO, YAMAMURA, and CORTEZ and Does 5-7]

78.    A.F., M.F., and E.F. re-allege and incorporate paragraphs 1 through 44 inclusive, as though fully set forth at this point, as they relate to a claim for relief for battery.

79.    A.F., M.F., and E.F. allege the facts and circumstances set forth hereinabove with regard to the physical touching of their persons by the employees of CITY and COUNTY named as

defendants herein, during their removal from their father. All such touching was offensive and non-consensual, and A.F., M.F., and E.F. submit the allegations set forth all necessary elements for a claim for relief against said defendants for battery.

80.   A.F., M.F., and E.F. allege that the facts and circumstances set forth hereinabove with regard to the physical and/or mental examinations and medicinal inoculations performed upon them in the care of COUNTY after removal, constitute a battery on their person. The touching associated with their physical examination and inoculations were offensive and non-consensual, and they submit the allegations set forth all necessary elements for a claim for relief against COUNTY and Does 5-7, who had care, custody, and control of the children at the time, for battery. Plaintiffs are unaware of the identity of the persons performing physical examinations and/or inoculations of the children, and will seek leave to amend this complaint to include the identities of such persons when ascertained.

81.   Plaintiffs A.F., M.F., and E.F. re-allege paragraph 45, as said damages relate to a claim for relief for battery.

82.   The punitive damage allegations of paragraph 46 apply in this claim for relief to all individually-named defendants.

## EIGHTH CLAIM FOR RELIEF

### BATTERY

[M.F. Against Doe 2]

83.   M.F. re-alleges and incorporates paragraphs 1 through 44 inclusive, as though fully set forth at this point, as they relate to a claim for relief for battery as against Doe 2.

84.   M.F. does not know the identity of Doe 2 at this time, but reserves the right to seek amendment of this complaint at such time as the identity of Doe 2 is ascertained, and alleges

herein the unlawful and offensive touching of M.F.'s person, without his consent, by Doe 2, and liability for said intentional acts of Doe 2 on the parent(s) of Doe 2 and/or the COUNTY which had care, custody and control of Doe 2 at the time of the incidents of sexual abuse and offensive touching complained of herein.

85.    Plaintiff M.F. re-alleges paragraph 45, as said damages relate to a claim for relief for battery.

86.    The punitive damage allegations of paragraph 46 apply in this claim for relief to all individually-named defendants.

## NINTH CLAIM FOR RELIEF

## NEGLIGENCE

[M.F. Against CORTEZ, LETONA, and Does 3–5 - Negligence In Placement & Supervision]

87.    M.F. reincorporates at this point, as though fully set forth, paragraphs 1- 76 hereinabove, as they relate to a claim for relief for negligence in the placement and supervision of M.F. in the COUNTY shelter, against defendants CORTEZ, LETONA, and Doe defendants 3 – 5, whose identities are unknown at this time.

88.    DOES 3-5, who were employed by COUNTY, failed to fulfill their mandatory duty to investigate the shelter to which M.F. was sent in Santa Clara County, and/or to adequately monitor placement of the M.F. in said home adequately.

89.    The COUNTY had placement and care responsibility for M.F. at the time of his sexual molestation in the COUNTY shelter, pursuant to California regulations governing the conduct of social workers in juvenile dependency proceedings (commonly referred to as "Division 31" or "Title 31" regulations).

90.    Pursuant to California Welfare and Institutions Code section 16000.1(a)(1), the defendant social workers and/or their supervisors had a duty to care for and protect M.F. in his placement, and in the decision to place him there, and they completely failed to fulfill either duty.

91.    It is the public policy of the State of California that child protection agencies and employees assume an obligation of the highest order to ensure the safety of children in their care. [Cal. W&I section 16000.1(a)(1)]

92.    M.F. had the statutory rights to live in a safe, healthy, and comfortable home where he was treated with respect, as well as possessing the right to be free from physical, sexual, emotional, or other abuse, or corporal punishment.  [Cal. W&I section 16001.9]

93.    The COUNTY and each of the defendant social workers are responsible for the supervision of the children and the supervision of the foster parents with whom they have been placed.  They have a mandatory duty to monitor the welfare of children in foster care, to report child abuse, to investigate suspicion of child abuse, and to investigate reports of child abuse, and to report those findings to the Department of Justice for placement of perpetrator and victim on the Child Abuse Central Index ("CACI").  These duties were not followed.

94.    COUNTY had in existence at the time of M.F.'s molestation, a policy, practice, and procedure directly violative of the California Title 31 Regulations, which require that an "emergency response" worker (i.e. a person trained in abuse investigations and not responsible in any manner for the placement of the children during dependency, therefore without a conflict as to the placement decision), conduct any investigations of child abuse or neglect occurring in a foster home.

95.    COUNTY'S policy and practice was to have the "family reunification" caseworker or some other non-emergency response qualified social worker, conduct the investigation of allegations of abuse.  Alternatively, in this case, neither an emergency response worker nor family reunification case worker investigated the allegations of abuse.

96.    Further, social workers have the duty to "do whatever is necessary to prevent psychological harm to the child victim," yet they did nothing to seek therapy or counseling services for M.F., or to perform a medical Sexual Abuse examination   [Cal. Pen. Code section 11164]  The social workers and/or defendant Does 3-5 placed M.F. with a child, Doe 2, with known inappropriate sexual tendencies and/or exposure to sexual abuse, figuratively if not literally placing him next to a ticking time bomb for being sexually abused.

97.    Each of the mandatory duties were breached by virtue of the lack of any investigation and/or any reasonable investigation into the allegations of abuse made by M.F., and the lack of any provision of services to M.F. to address the psychological trauma and severe emotional distress associated with being molested; going so far as to not divulge the abuse to the parents, or the aunt (KIM's sister) when the children were placed in her care.

98.    Although responsible for the supervision of the COUNTY shelter and the children therein, COUNTY actually provided almost no supervision.  This lack of supervision led directly to, and is a proximate cause of, the sexual abuse perpetrated on M.F.

99.    The social workers ignored warning signs that should have placed a reasonable social worker on notice that the shelter and the situation in which M.F. was placed posed a danger to the child.

Complaint
Fredenburg v. County of Santa Clara, et. al.
Case No.

100.   The failures were a primary, contributing, or proximate cause of M.F.'s sexual abuse by another child in the foster home and the resulting damages to M.F., and were substantially related to the policy, practice, and/or custom of COUNTY.

101.   M.F. re-alleges the general and specific damages set forth in paragraph 45, as they relate to a claim for relief for negligence in the placement and supervision of M.F..

**WHEREFORE, plaintiffs respectfully requests that this Court**:

1.)   Award to plaintiffs general, special and compensatory damages in an amount to be proven at trial.

2.)   Award to plaintiffs punitive damages against all individual defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the plaintiffs;

3.) Award to plaintiffs statutory damages and/or attorney fees against all defendants as allowed pursuant to 42 U.S.C. §1988 and C.C.P. §1021.5.

4.) Grant plaintiffs such other and further relief as the Court may deem just and proper.


DATE: August 24, 2007

_____
DENNIS R. INGOLS
Attorney for Plaintiffs


### DEMAND FOR JURY TRIAL

Plaintiffs demand jury trial per Rule 38(a) of the Federal Rules of Civil Procedure.


DATE: August 24, 2007

_____
DENNIS R. INGOLS
Attorney for Plaintiffs